IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MICHIGAN
Southern Division

UNITED STATES OF AMERICA
*ex rel.*
Elias Awad

                Plaintiffs,

v.

FIAT S.p.A., FIAT NORTH AMERICA, L.L.C.,
a Delaware limited liability company,
(collectively, "Fiat"), CHRYSLER GROUP,
LLC, a Delaware limited liability company,
MICHAEL MANLEY, SERGIO
MARCHIONNE, BARBARA PILARSKI,
RICHARD ROTH, Individuals,

                Defendants.

Civil Action No. 11-14082
Judge Avery Cohn
Qui Tam

**FILED UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(b)(2)**

**DO NOT PLACE IN PRESS BOX
DO NOT ENTER ON PACER**

---

**FALSE CLAIMS ACT COMPLAINT
AND
DEMAND FOR JURY TRIAL**

### Introduction

1.    Plaintiff, Elias Awad (the "Relator") brings this action, individually, and on behalf of the United States of America against Defendants for actual damages, treble damages and civil penalties arising from the Defendants' false statements and false claims in violation of the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This violation arises out of knowingly and fraudulently presenting false records or statements to conceal, avoid, and decrease an obligation to pay or transmit money or property to the U.S. Government of the United States.

2.    As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), the Relator has provided to the Attorney General of the United States and to the United States Attorney for the Eastern District of Michigan a statement of all material evidence and information related to the Complaint. The disclosure statement is supported by material evidence known to Relator at his filing establishing the existence of Defendants' false claims and active concealment. Because the statement includes attorney-client communications and work product of Relator's attorneys, and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, the Relator understands this disclosure to be confidential.

### Jurisdiction and Venue

3.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

AKEEL & VALENTINE, PLC
888 W. BIG BEAVER ROAD • SUITE 910 • TROY, MICHIGAN 48084-4736 • (248) 269-9595 • FAX (248) 269-9119
www.akeelvalentine.com

4. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because the acts proscribed by 31 U.S.C. §§ 3729 *et seq.* and complained of herein took place in this District, and is also proper pursuant to 28 U.S.C. § 1391(b) and (c), because at all times material and relevant, Defendants transact and transacted business in this District.

**Parties**

5. Relator Elias Awad is a citizen of the United States and a resident of the State of Michigan and brings this action on behalf of the United States of America.

6. All Defendants have done business at all relative times herein and are doing business within the jurisdiction of this court.

7. Defendant Chrysler Group, LLC ("Chrysler") designs, engineers, manufactures, distributes, and sells vehicles under the brand names of Chrysler, Jeep, Dodge, and Ram.

8. Chrysler is a Delaware limited liability company. It was formed on April 28, 2009, to complete the transactions contemplated by a certain Master Transaction Agreement[1], dated April 30, 2009, under which Chrysler agreed to purchase the principal operating assets of an entity named Old Carco.[2]

9. In connection with this transaction, Chrysler issued membership interests to UAW, Defendant Fiat North America, L.L.C., the U.S. Department of the Treasury ("U.S. Government"), and Canada CH Investment Corporation (or Canadian Government), in exchange for capital contributions and in consideration of the transactions contemplated by the Master Transaction Agreement.

10. Defendant Fiat North America, LLC is a Delaware limited liability Company. Defendant, Defendant Fiat, S.p.A is the parent company of Fiat LLC (collectively "Fiat") and is based in Italy. Defendant Sergio Marchionne has been the Chief Executive Office of Fiat and Chrysler at all relative times, herein. Defendant Michael Manley had been serving as President of Jeep and Lead Executive for International Operations for Chrysler at all relative times herein. Defendant, Barbara Pilarski, and Richard Roth had been serving as Vice President of Business Development, and Finance Director of International Business Development for Chrysler, respectively, at all relative times herein.

**Facts Common to All Counts**

11. In connection with the transaction, on June 10, 2009, Fiat, U.S. Government, Canadian Government, and the UAW executed an Operating Agreement (**Exhibit A**) which provided that Fiat could acquire additional ownership interest in Chrysler if it achieved (3) significant incremental benchmarks.

---

[1] According to a certain June 10, 2009, Operating Agreement, Master Transaction Agreement means the Master Transaction Agreement dated as of April 30, 2009, by and among Chrysler, Fiat parent, the U.S. Government, UAW and its affiliates, and the Canadian Government.
[2] Old Car Co. and its principal domestic subsidiaries then filed for bankruptcy protection and sought approval under Section 363 of the U.S. Bankruptcy Code of the transaction contemplated by this Certain Master Transaction Agreement which is referred to as the 363 Transaction.

2

12. The respective individual ownership interests for each Member in Chrysler, initially, were allocated approximately as follows: 1) Fiat, Twenty (20%) Percent; 2) UAW[3], Sixty (68%) Percent; 3) U.S. Government, Ten (10%) Percent; and 4) Canadian Government, Two (2%) Percent. (**Exhibit A**, pg 15 of Addendum)

13. According to the June 10, 2009, Operating Agreement entered with the U.S. Government, (**Exh A,** Section 3.4), it further provided that Fiat could increase its ownership interest in Chrysler in five percent (5%) increments upon the occurrence of three (3) events or benchmarks it achieves. Additionally, if it attains the three benchmarks, then Fiat could further increase its ownership interest by an aggregate of an additional 15% to 35% in Chrysler.

14. According to the June 10, 2009 Operating Agreement (Section 3.4), Fiat can increase its ownership interest by five percent (5%) increments in Chrysler, if it achieved one or more of the events or benchmarks listed below.

   a. Upon (A) receipt by the Company (Chrysler) of Technology Event Governmental Approvals for an engine . . . to be manufactured in the United States; and (B) the delivery to the U.S. Treasury of a new revocable commitment by the Company . . . to begin commercial production of the engine (or a vehicle) as soon as commercially practicable consistent with a certain Business Plan[4] in the Master Industrial Agreement[5] (known as the "*Technology Event*").

   b. Upon (A) the Company reporting cumulative revenues following the date of this Agreement of 1.5 billion or more as reported in the Company's quarterly financial statements, annual financial statements . . .; and (B) execution by the Company of one or more franchise agreements covering in the aggregate at least ninety percent (90%) of the total Fiat Group Automobile S.p.A. dealers in Latin America pursuant to which such dealers will carry Company products . . . (known as "*Non-NAFTA Distribution Event*"); and

   c. Upon (A) completion by the company of a certain Fuel Economy Test on a Chrysler-produced pre-production vehicle appropriate for such testing based on Fiat platforms or a vehicle technology regarding the fuel economy of at least 40 miles per gallon…(known as the "*Fuel Economy Event*").

---

[3] The UAW is comprised of several entities known as VEBA Hold Cos. under the Operating Agreement and are comprised of thirteen (13) chapters which include UAW VEBA Hold Co. Ch-00, LLC; UAW VEBA Hold Co. Ch-01, LLC; UAW VEBA Hold Co. Ch-02, LLC; UAW VEBA Hold Co. Ch-03, LLC; UAW VEBA Hold Co. Ch-04, LLC; UAW VEBA Hold Co. Ch-05, LLC; UAW VEBA Hold Co. Ch-06, LLC; UAW VEBA Hold Co. Ch-07, LLC; UAW VEBA Hold Co. Ch-08, LLC; UAW VEBA Hold Co. Ch-09, LLC; UAW VEBA Hold Co. Ch-10, LLC; UAW VEBA Hold Co. Ch-11, LLC; and UAW VEBA Hold Co. Ch-12, LLC.

[4] According to the June 10, 2009, Operating Agreement, Business Plan is the business plan approved by the Board of Directors within thirty (30) days following the Effective Date of the Operating Agreement, under which the business operation of the company would be conducted. As such, the Business Plan may be amended from time to time by the officers and approved by the Board of Directors. The Business Plan shall include the company's business strategy, distribution policy, basic goals, projected revenues, capital expenses, capital investments, financial planning, and cash flows.

[5] According to the June 10, 2009, Operating Agreement, Master Industrial Agreement means a master industrial alliance agreement dated as of the effective date between persons within the Fiat Group and Chrysler.

15. Further, according to the June 10, 2009 Operating Agreement entered with U.S. Government, it was agreed:

    a. The Company shall keep, or cause to be kept, (i) complete and accurate books and records of account of the Company, (ii) minutes of the proceedings of meetings of the Members, the Board of Directors and any committee thereof . . . *The books of the company (other than books required to maintain Capital Accounts), shall be kept on the accrual basis of accounting, and otherwise in accordance with GAAP*, and shall at all times be maintained or made available at the principal office of the company., *The Company shall, and shall cause <u>its Subsidiaries</u> to, (A) make and keep financial records in reasonable detail that accurately and fairly reflect all financial transactions and dispositions of the assets of the Company and its Subsidiaries* and (B) maintain a system of internal accounting controls sufficient to provide reasonable assurances that (1) transactions are executed in accordance with authorization by the Person in charge and are recorded so as to provide proper financial statements and maintain accountability for assets and (2) safeguards are established to prevent unauthorized persons from having access to the assets, including the performance of periodic physical inventories (**Exh A** Sec. 12.2) (emphasis added);

    b. That Chrysler's book profits and book losses shall be allocated to the members in proportion to the total interest of each member(sec. 4.2);

    c. That the Board of Directors for Chrysler shall total nine (9) where the United States Government shall initially designate three (3) Directors, the Canadian Government, (1) Director, the UAW, one (1) Director, and Fiat three (3) Directors. (**Exh A** Sec. 5.3);

    d. Unless otherwise determined by the Board of Directors, including a Fiat Director, the business, affairs and operations of the Company shall be conducted in a prudent manner in accordance with international automotive practices. The Board of Directors, including a Fiat Director, shall adopt corporate ethics, anti-bribery, anti-corruption, safety, environmental and other policies at least equivalent to those applicable to Fiat Parent. . . (c) on any matter involving a conflict of interest not provided for in this Agreement, each Director and Officer shall be guided by its reasonable judgment as to the best interests of the Company and its Subsidiaries and shall take such actions as are determined by such Person to be necessary or appropriate to ameliorate such conflict of interest . . . (d) Subject to, and as limited by the provisions of this Agreement (including <u>Section 5.8(d)</u>, the Directors and the Officers, in the performance of their duties as such, shall owe to the Company and its Members duties of loyalty and due care of the type owed under Law by directors and officers of a business corporation incorporated under the Delaware General Corporation Law . . . .(**Exh A** Sec. 5.14)

AKEEL & VALENTINE, PLC • TROY, MICHIGAN 48084-4736 • (248) 269-9595 • FAX (248) 269-9119
www.akeelvalentine.com
888 W. BIG BEAVER ROAD • SUITE 910

16. According to the June 10, 2009 Operating Agreement, the parties further agreed that Chrysler should not enter into any contract, agreement, understanding, loan, advance, or guarantee with or for the benefit of any Affiliate[6] that involves either (1) the payments in excess of Twenty-Five Million and no/100 ($25,000,000) Dollars, unless such affiliate transaction has been approved by a majority of the disinterested members of the Board of Directors; or (2) that if there are no interested members of the Board of Directors, Chrysler has obtained a favorable opinion of an independent expert as to the fairness of such transaction to Chrysler from a financial point of view (**Exh A** - Sec. 5.4).

17. According to the June 10, 2009 Operating Agreement, the parties further agreed that Major Decisions shall require an informative vote of the majority of the Board of Directors which would include any decision that involved the following (**Exh A** - Sec. 5.8):

    a.    A material change in the business purpose of the Company; and

    b.    Any consummation of any merger, business combination, consolidation, corporate organization, or any transaction constituting a change of control by the company with or into any entity;

    c.    Any proposal or action by the Company that is not in accordance with the Business Plan[7] and/or Annual Operating Budget;

    d.    To the extent applicable, any other decision over which the Company has granted approval rights to the US Treasury under the US Treasury Loan.

18. According to the June 29, 2011 Operating Agreement, it was also agreed that other decisions are to be decided by a majority vote 5.8(d), and in order to constitute a quorum for a vote, *the presence of the U.S. Government is required so long as they are a Member* (11.4).

**Background Facts Leading Up to the Fraud**

19. Relator Elias Awad had been an employee of Defendant Chrysler, and its predecessors, since 1998, where during the course of his employment, the last title he held was Financial Director – Chief Financial Officer of the Chrysler de Venezuela subsidiary.

20. Prior to being the Financial Director of the Venezuela Subsidiary for the time periods of 2010 and 2011, Relator was a regional controller for Latin America from 2007 to 2010.

21. During the course of the relationship, Relator was privy and part of several discussions between Chrysler and Fiat pertaining to the plan of having Defendant Fiat realize an increased ownership interest in Chrysler by achieving the three benchmark events described above, including the Second Event, Non-NAFTA Distribution Event.

22. On January 10, 2011, Fiat increased its ownership interest in Chrysler from 20% to 25% when the first benchmark event was realized that being the Technology Event, as defined above. (See also **Exhibit B** -- press release by both Chrysler and Fiat)

---

[6] According to the June 10, 2009, Operating Agreement, Affiliate means with respect to any person or other person that directly or indirectly whether two or one or through one or more intermediaries controls, is controlled by, or is *under common control* with such person. Person means any individual or entity.

[7] According to the First Amendment to the Operating Agreement, Business Plan must be approved by the Board of Directors and shall refer to Chrysler's business strategy (**Exh A** – Sec. 1.2 of the First Amendment).

With respect to the second benchmark event, the Non-NAFTA Distribution Event ("Second Event"), Fiat could not achieve the distribution objective of Chrysler products in Latin America. This is where Defendants conspired and devised a scheme to defraud the United States Government for the benefit of Fiat. This scheme included falsifying accounting records and concealing the true nature and manner in how Defendants circumvented the Second Event, and inducing the United States Government to suffer a decrease in its interest in Chrysler under the false pretense that Fiat achieved the Second Event, causing Fiat to acquire an additional five (5%) percent ownership interest, and eventually, a majority interest in the Company.

**Scheme to Defraud the U.S. Government**

23. During the course of his employment, Relator learned of a scheme by Defendants to circumvent the requirements mandated by the U.S. Government for the benefit of Fiat, so Fiat could realize an incremental ownership interest in Chrysler.

24. In January 2010, Relator was assigned as the lead financial analyst on the sale of a subsidiary for Chrysler in Columbia to be known as Chrysler Columbia.

25. Relator learned that insiders of Chrysler specifically, Mike Manley and Barbara Pilarski, had entered into negotiations exclusively with a European distributor known as S.K. Berge Group from Spain.

26. S.K. Berge Group ("Berge") already had previously established commercial relationships with Fiat across most of its business lines. Relator learned that Chrysler insiders, Mike Manley, Barbara Pilarski and Richard Roth, under the direction of Sergio Marchionne wanted to sell or dispose of the entire Chrysler Columbia subsidiary (a very lucrative and valuable asset, as later discussed) by selling it to S.K. Berge Group for a fraction of the true fair market value of the subsidiary, without obtaining approval from the Board of Directors, which had 3 U.S. Government appointed Directors.

27. When Relator conducted his analysis of the true fair market value of Chrysler Columbia, he determined that Chrysler Columbia had a fair market value in excess of One Hundred Million and no/100 ($100,000,000) Dollars.

28. Defendants, Mike Manley, Barbara Pilarski, and Richard Roth, instructed Relator to manipulate the books so as to reflect only a fraction of the true value for the Columbia subsidiary of only 1.5 million when it was well known that the Columbia subsidiary had a fair market value well in excess of 100 million dollars. Manley further advised Relator that these instructions were the explicit instructions of Sergio Marchionne.

29. Mike Manley and Barbara Pilarski further advised Relator that they, and Marchionne wanted Berge, *who was already distributing Chrysler products, to transfer its distribution network of Chrysler in Portugal to Fiat, in exchange for Chrysler disposing to Berge the lucrative Chrysler Columbia subsidiary for a consideration of far less than the true fair market value.*

30. In essence, the scheme ultimately benefited Fiat (an Affiliate), as later discussed, to achieve the Second Event Benchmark (Non-NAFTA Distribution Event) and increase its ownership interest in Chrysler by an additional five (5%) percent, when Marchionne arranged for the disposition of a lucrative Chrysler asset with the help of Chrysler insiders.

31. Relator objected to this arrangement vehemently, and emphasized the strongest need to report it to Chrysler's Board of Directors, including the 3 appointed U.S. Government directors. Relator further expressed the strongest opposition in the way Mike Manley and Barbara Pilarksi were trying to manipulate the value of the Columbia subsidiary, so as not to record its true value.

32. Relator also expressed his concern to Chrysler's counsel.

33. Relator repeatedly voiced his strongest concerns to Barbara Pilarski, Richard Roth and Mike Manley on several occasions, which resulted in Relator being taken off the project for the sale of the Chrysler Columbia transaction and later being reassigned to Venezuela.

34. Relator had the belief that what he was being asked to do was unlawful, in violation of the Generally Accepted Accounting Principles (GAAP), security laws, tax laws, and/or terms, conditions, rules and regulations promulgated by the United States Department of Treasury.

35. Further, Defendants' request to cook the books or manipulate the figures so as not to fairly represent the true financial picture was also in violation of one or more of the parties' Agreements[8], in addition to applicable federal laws including, but not limited to, the Internal Revenue Code, the Securities and Exchange Act, the Sarbanes-Oxley Act and other applicable federal law.

36. In addition to Relator's direct opposition to manipulate the records, personnel from the Columbia subsidiary pled with Relator to advise Chrysler's upper management: (1) not to be sold at such a drastic discount; and (2) that they have other investors that would pay substantially more for the subsidiary.

37. Relator and others advised Defendants Manley, Pilarski, and Roth of the opposition voiced by the management of the Columbia subsidiary and of the prospective investors who were willing to pay for in excess of what Berge was willing to pay, only to be ignored and refused.

38. Subsequently, Relator received a performance appraisal less favorable than in prior years and was further retaliated against by not being paid his promised compensation when he was reassigned to Venezuela.

39. In December 2010, upon information and belief, Chrysler finalized the transaction with S.K. Berge Group, where the Columbia subsidiary was sold to Berge for a fraction of its true market value, being an approximate sum of One Million Five Hundred Thousand and no/100 ($1,500,000) Dollars, rather than the true fair market value which exceeded One Hundred Million and no/100 ($100,000,000) Dollars without obtaining the required approval from the Board of Directors, including the U.S. Government appointed directors.

40. In consideration of S.K. Berge Group purchasing the Columbia subsidiary for only One Million Five Hundred Thousand and no/100 ($1,500,000) Dollars, upon information and belief, Berge transferred its Portugal distribution network, *which was already selling Chrysler products*, to Fiat.

---

[8] Agreements include the April 30, 2009, Master Transaction Agreement; the June 10, 2009, Amended and Restated Limited Liability Company; June 10, 2009, Shareholder Agreement; June 10, 2009, First Lien Credit Agreement, and the April 5, 2011, Third Amendment to the LLC Operating Agreement.

7

41. Furthermore, in April, 2011, the U.S. Government announced that it was ratifying the free trade agreement with Columbia, which further substantially increased the value of the Chrysler Columbia subsidiary in which Mike Manley and Barbara Pilarksi were fully aware that the fair market value of the Columbia subsidiary, would have a fair market value far in excess of One Hundred Million and no/100 ($100,000,000) Dollars, if the agreement had been entered into between the United States and Columbia.

42. Relator previously communicated the possibility of this increased value and, again, voiced his strongest oppositions, previously, to cook the books or alter the financial records.

43. In April 2011, Relator sent an email to upper management personnel that reported to Defendant Manley reflecting on the free trade agreement the United States struck with Columbia and further advised that now "Berge is counting their blessings all the way to the bank."

44. On April 5, 2011, Chrysler Group with Fiat and the UAW entered into a third amendment to the LLC Operating Agreement with the U.S. Government, which amended the Non-NAFTA Distribution Event benchmark for Fiat to provide that instead of requiring Fiat to distribute Chrysler products in ninety percent (90%) of its distribution network in *Latin America* as originally agreed upon, the benchmark was changed to provide that the ninety percent (90%) coverage would be in the *European Union. (Exhibit C)*

45. On April 12, 2011, only seven (7) days later, Chrysler and Fiat issued a press release claiming that Fiat met the Second Event benchmark (the Non-NAFTA Distribution Event), by representing that Fiat had made new arrangements to have Chrysler products distributed at ninety percent (90%) of its distribution network in Europe, *when all along Chrysler already had a distribution network in Europe that included its distribution agreement with Berge in Portugal.* **(Exhibit D)**

46. As a result of the representation made by Fiat and Chrysler, Fiat obtained an additional five percent (5%) ownership interest in Chrysler without providing proper disclosure, and as a result, the U.S. Government's interest was further diluted or decreased by six-tenths of a percent (.6%).

47. Neither Fiat, Chrysler or any of the other Defendants ever disclosed that they entered into a secret agreement to dispose of a very lucrative Chrysler subsidiary in Columbia to a third party, Berge, for a fraction of its true market value, in exchange for Berge transferring its distribution network of Chrysler products in Portugal to Fiat, so Fiat can claim that it achieved the Second Event benchmark when in reality Chrysler, all along already had Berge as distributor.

48. In essence, while Fiat represented to the U.S. Government that it engaged in efforts to increase Chrysler's distributorship of Chrysler cars in Europe to fulfill the Second Event benchmark to obtain an additional five percent (5%) increase in ownership of Chrysler, in actuality, Defendants concealed the scheme of disposing of a very valuable asset belonging to Chrysler, circumventing the U.S. Government's approval, thus, allowing Fiat to realize a windfall of an increase in its ownership interest in Chrysler by an increment of five percent (5%), while the U.S. Government suffered a dilution or a decrease in its interest as a result of the fraud committed by Defendants.

49. So basically, Fiat, through its CEO, Marchionne, disposed of a valuable asset of Chrysler for its benefit to increase Fiat's ownership interest in Chrysler valued at approximately in excess of $400 million, while at the same time decreasing or diluting the U.S. Government's interest by six-tenths of a percent (.6%).

50. In other words, Fiat, with the help of the insiders in Chrysler group, namely Manley, Roth, and Pilarski disposed of significant Chrysler assets by using a third party, S.K. Berge Group, as straw entity, to allow Fiat to realize an incremental five percent increase in ownership interest valued at approximately in excess of $400 million with no adequate consideration exchanged in return. This entire transaction escaped United States appointed directors and Board of Directors' approval and was not an arms length transaction.

51. Had the U.S. Government and the Board of Directors been informed that the Columbia subsidiary was going to be sold or disposed of for a fraction of its true value, the transaction would never have been approved and Fiat would never have realized the second benchmark (the Non-"NAFTA Distribution Event) in that manner, or obtained an additional windfall of five percent (5%) ownership interest in Chrysler.

52. Further, Chrysler and the individually named Defendants violated Sec 12.2 of the Operating Agreement (**Exh A**) by not maintaining accurate books and records violating the promised representation made to the U.S. Government in the Operating Agreement that *"Subsidiaries…keep financial records in reasonable detail that accurately and fairly reflect all financial transactions and dispositions of the assets of the Company and its Subsidiaries."*

53. Further, the named individual Defendants breached their fiduciary duties and Operating Agreement (Sec. 5.14) with the United States, who is a signatory to the Operating Agreement that had three appointed Directors with Chrysler, by compromising their judgment, to the detriment and against the best interests of the Company and its Subsidiaries.

54. Further, Defendants failed to properly disclose or obtain the required approval of the Board of Directors, or the U.S. Government, as required under Sections 5.8(d) and 11.4 of the Operating Agreement.

55. On May 24, 2011, Fiat exercised its option to purchase an incremental sixteen percent (16%) interest in Chrysler. (**Exhibit E** – press release)

56. On June 3, 2011, Fiat agreed with the U.S. Government that Fiat would pay the United States Five Hundred Million and no/100 ($500,000,000) Dollars to purchase the U.S. Government's remaining six percent (6%) ownership in Chrysler. (**Exhibit F** – press release)

57. On June 23, 2011, Relator was demoted, then terminated from his position by Chrysler, which it claimed that he abused the vehicle purchase policy two years earlier and had submitted a duplicate expense report for Two Hundred and no/100 ($200) Dollars, and where both allegations turned out to be false and constituted further acts of retaliation.

58. On July 28, 2011, Fiat made key appointments, including naming Mike Manley as the Chief Operating Officer of Asia making him one of the top 5 executives in Fiat and Chrysler. (**Exhibit G** – press release)

59. So, in essence, by the CEO of both Chrysler and Fiat, Marchionne, and insiders in Chrysler, knowingly making or causing to be made false statements, in addition to concealing the manner in which the Columbia Subsidiary was disposed of at a fraction of its true value, the U.S. Government suffered a dilution or decrease in its ownership interest in Chrysler, while at

the same time, Fiat realized a windfall of five percent (5%) in additional ownership interest in Chrysler valued at approximately $400 million.

60. Had Fiat and Chrysler and the individual Defendants disclosed to the U.S. Government appointed directors and the Board of Directors that Chrysler would be disposing of a substantial asset, the Columbia subsidiary at a fraction of its true value and, which would result in Fiat claiming that it obtained the second benchmark (the Non-NAFTA Distribution Event), approval would never have been provided and Fiat would not have met the second benchmark.

61. In sum, Defendants' fraudulent conduct involved a two-step plan:

a. Manipulate the books to substantially reduce the fair market value of the Columbia subsidiary so it can be disposed to Berge at a fraction of its true value; and

b. In consideration for Berge now obtaining control of the Chrysler Columbia subsidiary and escaping governmental approval, Berge transfers to Fiat its already existing distribution network of Chrysler products to Fiat to make it appear that Fiat secured additional distributor networks for Chrysler products so Fiat can claim that it met the Second Event Benchmark and obtain an additional five percent (5%) ownership interest in Chrysler.

## Count I

### *False Record; Fraudulent Concealment*

62. Relator realleges and incorporates the allegations of paragraphs 1-62, as if fully set forth herein.

63. As a result of the fraudulent conduct perpetrated by Defendants, the U.S. Government's interest in Chrysler was decreased by six-tenths of a percent (.6%) or diluted from 9.2% to 8.6% and Fiat realized a substantial windfall of a five percent (5%) increase in ownership interest in Fiat valued in excess of $400 million.

64. Defendants knowingly concealed the true nature of the Columbia-S.K. Berge Group transaction to avoid and decrease its obligation to pay or transmit money or property to the U.S. Government.

65. Defendants falsely concealed other commitments, including the disposition of a valuable Chrysler Columbia subsidiary for a fraction of its true fair market value to allow Fiat to realize a windfall of five percent (5%) ownership increase in Chrysler that Fiat would not otherwise have been able to obtain for its failure to realize the second benchmark. This course of conduct violated the False Claim Act of 31 U.S.C. § 3729 *et seq*, including but not limited to, 31 U.S.C. § 3729(a)(7).

66. The U.S. Government was unaware of this concealment of the transaction, which was also not disclosed in the financial statements as required, and, consequently, suffered a dilution of six-tenths of a percent (.6%) in its ownership interest in Chrysler.

67. As a result of Defendants' conduct, Fiat realized a windfall of an additional five percent (5%) additional ownership interest in Chrysler which approximates Four Hundred Million and no/100 ($400,000,000) Dollars.

AKEEL & VALENTINE, PLC
888 W. BIG BEAVER ROAD • SUITE 910 • TROY, MICHIGAN 48084-4736 • (248) 269-9595 • FAX (248) 269-9119
www.akeelvalentine.com

WHEREFORE, Relator respectfully requests this Court to enter a judgment against Defendants in whatever sum to which he is deemed and entitled together with interest, cost, and attorney fees.

## Count II

### *Conspiracy to Defraud the United States U.S. Government*

68. Relator realleges and incorporates the allegations of paragraphs 1-68, as if fully set forth herein.

69. Defendants combined, conspired, and agreed together to defraud the United States by knowingly concealing the Columbia Chrysler transaction to avoid or decrease an obligation by Fiat to pay or transmit money or property to the U.S. Government by causing the U.S. Government to suffer a dilution or decrease in its ownership interest in Chrysler while Fiat realized a substantial windfall, all in violation of 31 U.S.C. § 3729(a)(7) causing damage to the United States.

WHEREFORE, Relator respectfully requests this Court to enter a judgment against Defendants in whatever sum to which he is deemed and entitled together with interest, cost, and attorney fees.

## Count III

### *Retaliation of 31 U.S.C. § 3729(h)*

70. Relator realleges and incorporates the allegations of paragraphs 1-70, as if fully set forth herein.

71. From the time period Relator refused to cook the books and reduce the market value of the Columbia subsidiary from One Hundred Million and no/100 ($100,000,000) Dollars to One Million Five Hundred Thousand and no/100 ($1,500,000) Dollars, Relator was retaliated against, including by not limited to, being harassed, given poor evaluation, pulled off the assignment, transferred to Venezuela, not being paid his promised compensation, falsely accused, demoted, and discharged.

72. As a direct and proximate result of this unlawful and discriminatory harassment, Relator has suffered emotional pain and mental anguish, together with serious economic hardship, including lost wages and special damages associated with his efforts to obtain alternative employment in an amount to be proven at trial.

WHEREFORE, Relator respectfully requests this Court to enter a judgment against Defendants as follows:

    a. That the United States be awarded damages in the amount of three times the damages sustained by the U.S. because of the false concealment and fraud alleged in this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq* provides;

    b. That civil penalties of $11,000 be imposed for each and every false concealment that Defendants engaged in;

  c. That pre- and post-judgment interest be awarded along with reasonable attorney fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

  d. That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this Complaint;

  e. That the Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act; and

  f. For Count III, that Relator be granted all relief necessary to make him whole, including but not limited to two times his back pay and other compensatory damages sustained as a result of Defendants' harassment and retaliation; and

  g. That this Court award such other and further relief as it deems proper.

## Count IV

### *State Claim; Retaliatory Discharge in Violation of Public Policy*

73. Relator realleges and incorporates the allegations of paragraphs 1-73, as if fully set forth herein.

74. Defendants, through their agents, servants, or employees, violated the Generally Accepted Accounting Principles (GAAP), security laws, and/or terms, conditions, rules and regulations promulgated by the United States Department of Treasury, the United State Securities and Exchange Commission, and agreed to by the parties in Agreements[9], in addition to applicable federal law including, but not limited to the Internal Revenue Code, the Securities and Exchange Act, the Sarbanes-Oxley Act and other applicable federal law.

75. Relator refused to break applicable laws referenced above or violate GAAP, when demanded of him by his superiors, including the named Defendants, including but not limited to, Manley, Roth and Pilarski.

76. Defendant Chrysler discharged the Relator in whole or in part for refusing to break the law, including applicable security laws, or violate generally accepted accounting principles.

77. As a direct and proximate result of Relator's refusal to violate the law, GAAP principles and the terms and conditions provided by the U.S. Government to allow Fiat to increase ownership interest in Chrysler, and as a result of Defendants' retaliatory discharge of Plaintiff, Plaintiff has been placed in financial distress, has suffered loss of wages and benefits, pension, stock options, loss of earning capacity, loss of the ability to work, and will suffer these losses in the future.

78. As a direct and proximate result of Defendants' violations stated above, Plaintiff has suffered depression, emotional and physical distress, mental and physical anguish, humiliation, loss of reputation and embarrassment, and will suffer these problems in the future.

---

[9] Agreements include the April 30, 2009, Master Transaction Agreement; the June 10, 2009, Amended and Restated Limited Liability Company; June 10, 2009, Shareholder Agreement; June 10, 2009, First Lien Credit Agreement, and the April 5, 2011, Third Amendment to the LLC Operating Agreement.

WHEREFORE, Relator respectfully requests this Court to enter a judgment against Defendants in whatever sum to which he is deemed and entitled together with interest, cost, and attorney fees.

                              Respectfully Submitted,

                              AKEEL & VALENTINE, PLC

                                    s/ Shereef H. Akeel
                              By:    Shereef H. Akeel P54345
                              Attorneys for Relator
                              888 West Big Beaver Road, Suite 910
                              Troy, MI  48084-4748
                              Telephone: (248) 269-9595

DATED:  September 20, 2011

AKEEL & VALENTINE, PLC · TROY, MICHIGAN 48084-4736 · www.akeelvalentine.com · (248) 269-9595 · FAX (248) 269-9119
888 W. BIG BEAVER ROAD · SUITE 910

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MICHIGAN
Southern Division

UNITED STATES OF AMERICA
*ex rel.*
Elias Awad

        Plaintiffs,

v.

FIAT S.p.A., FIAT NORTH AMERICA, L.L.C.,
a Delaware limited liability company,
(collectively, "Fiat"), CHRYSLER GROUP,
LLC, a Delaware limited liability company,
MICHAEL MANLEY, SERGIO
MARCHIONNE, BARBARA PILARSKI,
RICHARD ROTH, Individuals,
        Defendants.

Civil Action No. 11-14082
Judge Avery Cohn
Qui Tam

**FILED UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(b)(2)**

**DO NOT PLACE IN PRESS BOX
DO NOT ENTER ON PACER**

---

## DEMAND FOR JURY TRIAL

NOW COMES Relator by and through his undersigned counsel, Akeel & Valentine, PLC, and hereby demands a trial by jury for the above-referenced cause of action.

        Respectfully Submitted,

        AKEEL & VALENTINE, PLC

            s/ Shereef H. Akeel
        By:    Shereef H. Akeel P54345
        Attorneys for Relator
        888 West Big Beaver Road, Suite 910
        Troy, MI 48084-4748
        Telephone: (248) 269-9595

DATED: September 20, 2011

AKEEL & VALENTINE, PLC • 888 W. BIG BEAVER ROAD • SUITE 910 • TROY, MICHIGAN 48084-4736 • (248) 269-9595 • FAX (248) 269-9119
www.akeelvalentine.com